**UNISOURCE WORLDWIDE, INC, Plaintiff,**

v.

**Anthony VALENTI, Kathleen Valenti, Jay Greenglass, Linda Remenschneider, Renee Marquart, Andre Gillard, John Barrotta and Matrix Group Ltd., Defendant.**

**Anthony Valenti, Plaintiff,**

v.

**Unisource Worldwide, Inc., Defendant.**

**Nos. CV 01–7157, CV01–6090.**

United States District Court, E.D. New York.

April 19, 2002.

Gallagher Gosseen Faller & Crowley by William E. Vita, Esq., Garden City, NY, for Unisource, Inc.

Mario B. Mikelinich, P.C. by Mario B. Mikelinich, Esq., Hicksville, NY, for Anthony Valenti, Kathleen Valenti and and Matrix Group, Ltd.

Alan B. Pearl & Associates, P.C. by Alan B. Pearl, Esq., Syosset, NY, for Barrotta, Remenschneider, Greengrass and Marquart.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

These actions, filed under Docket Numbers CV01–6090 and CV 01–7157 arise out of the parties' business relationship in the sale and distribution of paper and protective packaging products. In November of 2001, Unisource moved, in action number 01–7157, for preliminary injunctive relief. That motion was referred to the Honorable William D. Wall, United States Magistrate Judge, for the purpose of conducting a hearing and issuing a report and recommendation.

The parties appeared before Magistrate Judge Wall and presented their respective positions on five separate hearing dates. Testimony was taken and documentary evidence was presented. Thereafter, the parties were given the opportunity to submit post-hearing memoranda.

Upon review of all of the evidence, Magistrate Judge Wall issued an extensive and detailed Report and Recommendation dated January 24, 2002 (the "R & R"). The R & R recommended that Unisource's motion for a preliminary injunction against Defendants Anthony Valenti, Kathleen Valenti and Matrix Group, Ltd be granted and that such injunctive relief be denied as to Jay Greengrass, Linda Remenschneider, Renee Marquart and John Barrotta.

The parties were given the opportunity to submit objections to the R & R and those objections are presently before the court.

The court has reviewed the R & R, the objections thereto and the submission seeking adoption of the R & R. Upon such review, the court adopts the R & R, which is published herewith, in its entirety.

The court is aware that there remain several claims for adjudication in this matter and is also aware that an appropriate scheduling order has been entered into

with respect to those claims. As a final housekeeping matter, the court orders the Clerk of the Court to consolidate the cases filed under docket numbers CV 01–6190 and CV 01–7157 under the latter docket number.

SO ORDERED.

## REPORT AND RECOMMENDATION

WALL, United States Magistrate Judge.

Before the court is the plaintiff's motion for a preliminary injunction referred to the undersigned by District Judge Leonard D. Wexler on November 11, 2001 for a report and recommendation. The parties appeared for a hearing on November 9, November 13, November 20, November 26 and November 27, 2001. At the close of the hearing the parties requested an opportunity to submit post-hearing memoranda. That request was granted and the parties were given until December 11, 2001 to submit post-hearing memoranda. The parties then requested additional time and that request was also granted.

Based on the plaintiff's memorandum of law in support of the motion, its reply memorandum, the affidavits of William E. Vita, plaintiff's counsel, John Keller, an Administrative Manager at Georgia–Pacific, Gary Melampy, the plaintiff's Director of Field Human Resources, Diane Nussbaum, the plaintiff's Director of Purchasing Supply Systems. Michael J. McKeever, a private investigator retained by the plaintiff, John Czarkowski, a Customer Service Manager at Georgia–Pacific, Jack Weilar, a former executive at the plaintiff corporation, Anthony and Kenneth Santare, private investigators retained by the plaintiff, Bryna Rugen, a paralegal employed by the plaintiff's counsel, and Nick Johannes, the plaintiff's Manager of Business Analysis, and the plaintiff's post-hearing memorandum, along with the defendants' memorandum of law in opposition, the affidavits of the defendants Kathleen Valenti, Jay Greengrass, John Barrotta, Andre Gillard[1], Renee Marquart, Linda Remenschneider, and Anthony Valenti, and the post-hearing memorandum in opposition of the defendants, Matrix Group, Ltd., Anthony Valenti and Kathleen Valenti (collectively referred to as the "Valenti defendants"), and the "Findings of Fact and Conclusions of Law" of the defendants, Jay Greengrass, Linda Remenschneider, Renee Marquart, Andre Gillard and John Barrotta (collectively referred to as the "employee defendants"), the testimony of all of the witnesses at the hearing, the oral arguments and the applicable law, the undersigned recommends that injunctive relief be granted against Anthony Valenti, Kathleen Valenti and Matrix Group, Ltd.

## FACTS

The plaintiff, Unisource Worldwide, Inc., ("Unisource"), is a Delaware corporation that sells and distributes paper and protective packaging products. Vita Aff. at ¶ 8. In 1996, Unisource bought a company named Spero Wallach. Tr. 11/20 at 156. The defendant, Anthony Valenti was a shareholder and employee of Spero Wallach. *Id.* After the sale, Anthony Valenti remained employed by Unisource as an Executive Vice–President and salesman, until his suspension on October 26, 2001, pursuant to the terms of an Employment and Non–Competition Agreement ("the Employment Agreement"). Anthony Valenti Aff. at ¶¶ 1 and 8. The Agreement addressed, *inter alia*, the use by Anthony

---

1. The plaintiff has submitted a Stipulation of Discontinuance for the defendant Andre Gillard.

Valenti of confidential information, and included a restrictive covenant clause. It provided, in pertinent part:

E. *Non–Competition Covenant.* In consideration of Employee's employment hereunder and Unisources' obligations and other agreements contained herein, Employee hereby agrees that, during (i) the Employment Period under this Agreement (including any Renewal Period), (ii) during the initial Severance Period, if applicable, (iii) any continued employment after termination of this Agreement, and (iv) for a period equal to two (2) years after the latter of the date of termination of his employment with Unisource for any reason whatsoever or the expiration of any Initial Severance Period, Employee shall not, directly or indirectly, (either as principal, agent, employee, employer, investor for investments of no greater than 3% of the total outstanding shares in any publicly traded company in related businesses of Unisource's business), consultant, controlling stockholder, co-partner or in any other individual capacity whatsoever, (A) within New York City or within a 100 mile radius of New York City or within any other marketing area currently serviced by the Company, or within any other marketing areas which later come under Employee's supervision or responsibility as part of the SWC Division or Unisource, engage in or carry on in the business of selling and distributing industrial paper, packaging, food service, office service, and janitorial supplies that are similar to, competitive with, or currently sold by the Company or hereafter sold by the SWC Division or Unisource, or any related business, (B) solicit the business of any of the Company's or SWC Division's or Unisource's customers (including, but not limited to, present customers and any customers who become customers prior to the expiration of the restrictive covenant provisions set forth in this section) with respect to the products sold and services performed by the Company, the SWC Division, or Unisource, or (C) induce or encourage any employee in the above-described business to leave the SWC Division or Unisource.

Vita Aff. at Ex. G.

Anthony Valenti's employment is also governed by the terms of a Confidentiality and Patent Agreement ("the Confidentiality Agreement"), incorporated by reference into the Employment Agreement. It provided, in pertinent part:

2. *Disclosure of Confidential Information.* I shall not at any time during the term of my employment or thereafter, ... use, publish, disclose or authorize anyone else to use, publish, or disclose any confidential information belonging to [Unisource, an Alco Standard Corporation company]. Confidential information includes, but is not limited to, models, drawings, memoranda and other materials, documents or records of a proprietary nature, information relating to research, finance, accounting, sales, personnel management and operations; and information particularly relating to customer lists, price lists, customer service requirements, costs of providing service and equipment, pricing, and equipment maintenance costs.

*Id.*

Anthony Valenti claims that in March 2001 he attended an awards banquet where a Unisource Vice–President commented that it was "[Unisource's] intention to get rid of all of the old owners of

companies that were purchased by Unisource . . . ." Valenti believed that this comment was directed at him, since he had been a shareholder of Spero Wallach. Valenti Aff. at ¶ 5. Anthony Valenti contends that the statement was the beginning of a scheme to force him out of the company, which involved misrepresenting the cost of goods for the purpose of reducing the amount of commissions to be paid, refusing and/or delaying payment to him for commissions and expenses, and diverting accounts to other Unisource employees. *Id.* As a result, on September 10, 2001, Anthony Valenti commenced an action against Unisource, bearing index no. CV 01–6090, seeking an accounting, money damages and a declaration that the restrictive covenant is unenforceable. Valenti Aff. at ¶ 6.

Meanwhile, in April 2001, Anthony Valenti's wife, the defendant Kathleen Valenti, met with the couple's accountant, Rochelle Nechin, and developed a business plan to set up a business identical to the business Anthony Valenti was engaged in on behalf of Unisource. Tr. 11/27, p. 14; Hearing Ex. DD. Following this meeting, the Valentis sought the advice of their lawyer, Mario Mikelinich, as to whether Mrs. Valenti's business would be in conflict with Mr. Valenti's obligations under his Employment Agreement. Tr. 11/27 at p. 112. Kathleen Valenti testified that "she was instructed at the meeting that as long as her husband did not have any interest in her company and didn't give her any information that she would be able to start a company." Tr. 11/27 at 45–46.

Ms. Nechin, who was also present at the meeting with the attorney, testified that Anthony Valenti expressed concern that Kathleen Valenti's new business would "impinge on him." Tr. 11/27 at 113. Ms. Nechin's testimony regarding the meeting conflicts with the testimony of both Anthony and Kathleen Valenti. According to Kathleen Valenti, her husband wasn't happy about her new company because "it was a tough business," not because it would be in conflict with his. Tr. 11/27 at 17. She testified that although her husband attended the meeting with Mario Mikelinich, he "didn't say a word." Tr. 11/27 at 42–3. Anthony Valenti, on the other hand, testified that he never discussed with his wife "why she was opening a packaging company," and did not remember if she told him she was going to incorporate Matrix before she did. Tr. 11/26 at 56.

On June 5, 2001, Kathleen Valenti formed the Matrix Group Ltd. ("Matrix") and made an initial investment of $500,000 from the couple's joint brokerage account. Tr. 11/27 at 35. Kathleen Valenti's testimony regarding this initial investment for Matrix speaks for itself:

Q. The end of 2000 and then at the beginning of 2001 you took money out of your joint brokerage accounts and created brokerage accounts under your own name; is that right?

A. We took money out, yes, I did.

Q. You took money out and put it in accounts under your own name; is that right?

A. We took— I took money out, yes. It was my money. I could do whatever I want with it.

Q. And you said we took it out. You and your husband both took money out of the joint accounts?

A. No, I took it out. Excuse me. I made a mistake. I took the money out.

Q. Because it's your money and you can do what you want with it—

A. That's right.

Tr. 11/27 at p. 35.

Shortly thereafter, Ms. Nechin "volunteered" to hire employees for Matrix. Tr. 11/27 at 99. Ms. Nechin contends that she did so as a consultant for Matrix on behalf of her accounting firm, J.K. Peskow. Tr.

11/27 at 108. It is clear from the record, however, that Ms. Nechin's accounting firm was not compensated for its role as consultant or hiring agent. Rather, Ms. Nechin will bill Matrix in the future, "unless something happens in the way of [her] going into the company as a shareholder." *Id.*

Ms Nechin hired Jay Greengrass, a Unisource purchasing agent, Linda Remenschneider, a customer service representative at Unisource, and Renee Marquart, Anthony Valenti's assistant at Unisource., and Andre Gillard, the manager of a Unisource warehouse. Kathleen Valenti, was instrumental in hiring John Barrotta, another Unisource salesman. It is clear from the testimony that with the exception of the comptroller, all key personnel employed by Matrix were formerly Unisource employees. Ms Nechin states that she was able to hire the four Unisource employees through the use of an ad in Newsday and contacts with her clients in the packaging business. Tr. 11/27 at 99–104. Ms. Nechin and Kathleen Valenti both claim that they did not ask Anthony Valenti for advice or leads about potential employees. Tr. 11/27 at 101.

Like most of the testimony by the defendants and their witnesses, these claims are utterly incredible. The defendants would have this court believe that Kathleen Valenti started Matrix, a company in direct competition with her husband's employer's company, to alleviate the "empty nest syndrome" she was suffering from; that she started Matrix without any involvement of her husband; that she never discussed the formation of her company with him; that she did not mention to him that she took $500,000 out of a joint account to start matrix; and that it is mere coincidence that all the key personnel hired for Matrix were former Unisource employees.

Unisource contends that Matrix was formed to enable Anthony Valenti and oth-er Unisource employees to unlawfully compete against it and to establish a place for Anthony Valenti to work "down the road." Post Hearing Memo. at 5; Tr. 11/27 at p. 42. Unisource argues that, based on the facts presented at the hearing, the individual defendants have breached their fiduciary duty to Unisource and have used confidential information to divert sales away from Unisource to Matrix. The court agrees.

## DISCUSSION

### 1. Preliminary Injunction Standards.

"A party seeking a preliminary injunction must establish that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999).

Unisource seeks a preliminary injunction restraining and enjoining the defendants from "(1) Contacting, soliciting or communicating with any Unisource customer for the purpose of obtaining sales or business from that customer . . .; (2) Selling any products or services to any of Unisource's customers; [and] (3) Using proprietary items of Unisource. See Complaint. Although the Complaint advances nine causes of action, the crux of Unisource's argument is that Anthony Valenti has breached his Employment Agreement, that the employee defendants have breached their fiduciary duty to Unisource (referred to collectively as the "Employee defendants") and that all of the individual defendants have used its confidential information." See Plaintiff's Post–Hearing Mem. of Law at 10–25. In their Post–Hearing Memoranda of Law, the defen-

dants also focus on the breach of contract, breach of fiduciary duty, and misappropriation of trade secrets claims, but argue that the plaintiff has failed to submit sufficient evidentiary proof to support these allegations.

## 2. Likelihood of Success on the Merits/Serious Questions Going to the Merits.

### A. The Valenti Defendants

Anthony Valenti signed an Employment Agreement that provided that he would not sell goods of the same kind sold by Unisource, solicit any of Unisource's customers or induce any employee to leave Unisource (see Employment Agreement at ¶ 5), and that he would not disclose any confidential information belonging to Unisource during the term of his employment (see Confidentiality Agreement at ¶ 2). Unisource contends that, as the driving force behind the creation and operation of Matrix, Anthony Valenti has breached both the restrictive covenant set forth in the Employment Agreement and the Confidentiality Agreement. To prevail on this claim, Unisource must, therefore, demonstrate that the restrictive covenant is enforceable and that Anthony Valenti's actions amount to a breach of the covenant or demonstrate that he has breached the Confidentiality Agreement through his actions. It has proven both.

Anthony Valenti does not deny that he signed the Employment Agreement; he does, however, contend that the Employment Agreement in its entirety cannot be enforced due to Unisource's alleged breach of contract. He also disputes the enforce- ability of the restrictive covenant, arguing that it is not reasonable. See Valenti Defendant' Post–Hearing Mem. at 10–12.

As a threshold matter, the Valenti defendants' allegation that Unisource has breached its contract with Anthony Valenti is not sufficiently supported in the record. Anthony Valenti has testified that Unisource engaged in conduct designed to force his resignation to avoid the payment of a severance package, but has failed to establish how Unisource's conduct amounted to a breach of the Employment Agreement. Nor has he provided any legal support for his contention that a breach by Unisource would prevent enforcement of the entire Employment Agreement.

 Anthony Valenti also argues that the restrictive covenant is unreasonable. A restraint is reasonable under New York law [2] if it: "(1) is no greater than is required for the protection of a legitimate interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public (citations omitted)." *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999). In applying these factors, the courts look first to the specific terms of the covenant. "The issue of whether a restrictive covenant not to compete is enforceable by way of injunction depends in the first place upon whether the covenant is reasonable in time and geographic area." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999)(citing *Reed, Roberts Assocs. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976)). "In this equation, the courts must weigh the need to protect the

2. The Employment and Non–Competition Agreement provides, at section 9, that it should be construed in accordance with New York law, and the parties have relied on New York law in regard to restrictive covenants. The have also relied on New York law in regard to the breach of fiduciary duty and use of confidential information claims. The court will thus apply New York law to a determination of whether Unisource has established a likelihood of success or sufficiently serious question going to the merits, with a balance of hardships tipping in its favor, on those grounds.

employer's legitimate interests against the employee's concerns regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York." *Id.* The Second Circuit, applying New York law in *Ticor*, recognized the tension between the competing interests of employer and employee, noting that "the way to deal with these conflicting interests is by contract." *Id.* at 70. As in *Ticor*, Unisource and Anthony Valenti entered into a contract and the defendant, Anthony Valenti, now claims that the restrictive covenant provision of that contract is unenforceable. See Valenti Defendants' Post Hearing Mem. at 11–12.

■ Here, no party has addressed whether the temporal restriction is reasonable, but it should be noted that the court finds it to be so. Anthony Valenti argues, however, in both his memorandum in opposition to the motion and his post-hearing memorandum, that the geographic limitation is too broad, and is thus, unreasonable. The court agrees that the geographic limitation is troubling. By the terms of the Employment Agreement, Anthony Valenti's activities are restricted as follows:

> within New York City or within a 100 mile radius of New York City or within any other marketing area currently serviced by the Company, or within any other marketing area which later comes under Employee's supervision or responsibility as part of the SWC Division or Unisource, engage in or carry on in the business of selling and distributing industrial paper, packaging, food service, office service, and janitorial supplies that are similar to, competitive with, or currently sold by the Company or hereafter sold by the SWC Division or Unisource, or any related business.

Unisource is a large company, which services accounts in many areas of the country. The geographic limitation, therefore, covers a very large area, and this court finds it to be unreasonable.

■ This does not mean, however, that the restrictive covenant is unenforceable in its entirety. If a court finds a limitation to be unreasonable, it can "blue pencil" the covenant to restrict the term to a reasonable geographic limitation, and grant partial enforcement for the overly broad restrictive covenant. *See BDO Seidman*, 93 N.Y.2d at 394, 690 N.Y.S.2d 854, 712 N.E.2d 1220. The geographic term of the Agreement will be reasonable if reduced. The court need not make a determination of what precise geographic range would be reasonable, however, because under any reasonable interpretation, Anthony Valenti is prohibited from starting a competing business here in Lake Success or Syosset. Thus, the court finds the restrictive covenant to be reasonable in scope.

■ Covenants that are found to be reasonable in scope will be enforced only "to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3), in those cases where the employee's services to the employer are deemed special or unique." *Ticor*, 173 F.3d at 70(citing *Purchasing Assocs. v. Weitz*, 13 N.Y.2d 267, 272–73, 246 N.Y.S.2d 600, 196 N.E.2d 245(1963)(Fuld, J.)). The court will consider only the first two possible grounds, as no party has argued that Valenti was a unique employee.

As noted, *supra*, Unisource argues that an injunction should issue because the defendants are using Unisource's trade secrets and/or confidential information. See Plaintiff's Post Hearing Mem. at 20–25. Indeed, the parties all use the terms trade secrets and confidential information interchangeably and the relevant cases make little distinction between the two. None-

theless, the two constitute separate grounds for enforcement of the restrictive covenant, and they must, therefore be treated individually.

■■■ "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997)(applying New York law and quoting Restatement of Torts § 757 cmt. b (1939)), *cert. denied*, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998). New York courts consider several factors in determining whether information constitutes a trade secret, including: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir.1999).

■■■ Here, Unisource argues that its customer lists, pricing, and volume information are trade secrets. See Plaintiff's Post–Hearing Mem. at 20–25. "A customer list developed by a business through substantial effort and kept in confidence may be treated and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). In addition, knowledge of a customer's needs and specifications and the prices charged to that customer are considered confidential. *Giffords Oil Co., Inc. v. Wild*, 106 A.D.2d 610, 611, 483 N.Y.S.2d 104 (N.Y.A.D. 2d Dep't 1984).

The Valenti defendants argue that trade secret protection is not warranted here because there are no customer lists in a physical sense; Unisource takes no steps to guard the information; and Unisource's customer information is readily ascertainable. Valenti Defendants' Post Hearing Mem. at 3–10. Each of the defendants' assertions will be addressed in turn.

Unisource established at the hearing that it maintained customer names, items sold to that customer, and pricing information in its computer system. Tr. 11/9 at 102; 11/13 at 75. In fact, a customer history spreadsheet containing this information was prepared for the defendants, Anthony Valenti and Renee Marquart, at their request, two weeks before Matrix was incorporated. Tr. 11/9 at 104, 106. Unisource also established that access to the system requires a user identification number and a password. *Id.* Thus, the defendants' first two arguments regarding trade secret protection are without merit.

The Valenti defendants' argument that trade secret protection does not attach because Unisource's customers are readily ascertainable must also be rejected. The Valenti defendants appear to be relying on the "readily ascertainable" standard set forth in *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972), that is, "where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach." *Leo Silfen*, 29 N.Y.2d at 392, 328 N.Y.S.2d 423, 278 N.E.2d 636. Although *Leo Silfen* does apply the stan-

dard set forth by the Valenti defendants, they have failed to note a significant exception to this rule. The "readily ascertainable" standard does not apply in cases where, as here, an agreement expressly prohibits disclosure of customer lists. *See, e.g., North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 47 (2d Cir.1999)(*"Leo Silfen* implies that its holding is limited to cases lacking an express agreement protecting customer lists"). Thus, with respect to Anthony Valenti, the plaintiffs have established that the restrictive covenant should be enforced to prevent disclosure of a trade secret.

The covenant should also be enforced on the second ground, that is, to prevent the release of confidential information. As stated above, the Confidentiality Agreement defines confidential information to include "customer lists, price lists, and customer service requirements." Vita Aff. at Ex. G. While the precise way in which Matrix obtained the information remains murky, it is clear to the court that every customer serviced by Matrix is a former customer of Unisource and that all of Matrix's pricing is the same as or better than Unisource's. Tr. 11/9 at 75–82 and 11/13 at 145–46. Indeed, knowing which businesses to solicit and what price to offer them was a key to the success of Matrix. Common sense dictates the conclusion that Matrix could not have established itself so quickly and efficiently without the benefit of Unisource's customer information. Accordingly, the court finds that the restrictive covenant should be enforced to prevent disclosure of Unisource's trade secrets and the release of confidential information regarding its customers.

Having found the restrictive covenant and the Confidentiality Agreement to be enforceable, the court must now address the question of whether Anthony Valenti by his actions violated their terms. As previously stated, the Employment Agreement provides that, "[Anthony Valenti] shall not, . . . (A) engage in or carry on the business of selling or distributing [paper and packaging products], . . . (B) solicit the business of any of . . . Unisource's customers, . . . or (C) induce or encourage any employee in the above described business to leave . . . Unisource." The Confidentiality Agreement prohibits the disclosure of any confidential information belonging to Unisource. Anthony Valenti denies that he has engaged in any of the prohibited conduct and argues that Matrix is wholly owned and operated by his wife, Kathleen Valenti, and that she is not prohibited from such conduct. Although it is true that Kathleen Valenti owes no independent duty to Unisource, nor is she contractually bound, the court finds the argument to be without merit.

The details of Anthony Valenti's involvement remain buried in the lies told by the defendants who testified at the hearing. It may well be that without the benefit of a tape recorder in the Valenti home, hard proof may never be revealed, but based on all of the evidence before the court, as well as the demeanor of the witnesses, this court finds that the plaintiff is likely to establish that Anthony Valenti is doing business through Matrix, in breach of his Employment Agreement, despite the fact that his wife, Kathleen Valenti, is the record owner and claims to be involved in its day to day operations.[3]

## B. The Employee Defendants

 In addition to the argument that Anthony Valenti breached his Em-

---

**3.** The plaintiff seeks to enjoin Rochelle Nechin despite the fact that she is not a party to the lawsuit. The plaintiff has indicated that it intends to make a motion to amend its complaint to include a cause of action against her. The court will not address the plaintiff's arguments with respect to Ms. Nechin at this time.

ployment Agreement, the plaintiff also argues that the defendants have used Unisource's confidential information and have breached their fiduciary duties to Unisource. Employees owe a duty to their employers not to divulge confidential information. *See DoubleClick, Inc. v. Henderson*, 1997 WL 731413, at *4 (N.Y.Sup., Nov. 7, 1997). "Even in the absence of a contract restriction, a former employee is not entitled to solicit customers by fraudulent means, the use of trade secrets or confidential information." *Id.* at *4, n. 2. Nor can employees conspire to set up a competing businesses while they are still employed. *See Arnold's Ice Cream Co. v. Carlson*, 330 F.Supp. 1185 (E.D.N.Y. 1971).

While the record establishes that Anthony Valenti both used confidential information and breached his fiduciary duties to Unisource, the court must find that based on the disputed facts and legal argument before it, the plaintiff falls short of establishing a likelihood of success as against the employee defendants as to those claims. And, while the plaintiff has raised serious questions going to the merits regarding the employee defendants, it has not shown that the balance of hardships tips in its favor as against these defendants. The plaintiff may well establish these claims against the employee defendants after discovery is conducted, but there is not enough in the record now to support injunctive relief against the former employees directly.

Although the court does not recommend the imposition of injunctive relief against these defendants individually, the impact of the injunction against Anthony Valenti, Kathleen Valenti and Matrix will have the effect of preventing the former employees from using Unisource's confidential information to divert sales away from Unisource to Matrix in derogation of the duty they owed to Unisource. This is, the court

believes, a just result. Each of Unisource's former employees knew that they were taking a chance in going to work for Matrix, and must have been aware of Anthony Valenti's role in the formation of the company. When they left Unisource, they allied themselves with the fortunes of Matrix, and now they must live with that decision.

### 3. Irreparable Harm.

Unisource has shown that it will suffer irreparable harm without injunctive relief. The "use and disclosure of an employer's confidential information and the possibility of loss of customers through such usage" can constitute irreparable harm (*Ecolab v. Paolo*, 753 F.Supp. 1100, 1110 (S.D.N.Y.1991)), and the loss of goodwill can constitute irreparable harm which cannot be compensated by money damages. *Id.* at 1109. The plaintiff has met its burden of establishing that it possesses trade secrets or confidential information, and thus, the undersigned recommends that the application for preliminary injunctive relief be granted.

### CONCLUSION

Based on the foregoing, the undersigned recommends that the plaintiff's motion for a preliminary injunction be granted as against the defendants Anthony Valenti, Kathleen Valenti and Matrix Group, Ltd. and denied as against Jay Greengrass, Linda Remenschneider, Renee Marquart, and John Barrotta.

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 10 days of the date of this Report. Failure to file objections within this period waives the right to appeal the District Court's order. *See 28*

U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir.1996).