**EURO–CUT, INC. d/b/a Labriute Meals, Plaintiff,**

v.

**Meyer FUTERSAK, Marketrend, Ltd. and John Doe Entities 1–10, Defendants.**

**No. CV 06–2219.**

United States District Court, E.D. New York.

Jan. 31, 2007.

---

**8.** Tudoran's affidavit was filed after the government's response.

dants Meyer Futersak ("Futersak") and Marketrend, Ltd. ("Marketrend"), a company Futersak owns and controls, asserting various contract and tort claims arising from Futersak's alleged violation of an employment agreement with Euro–Cut. Euro–Cut moves for a preliminary injunction. For the reasons below, the motion is denied.

## I. *BACKGROUND*

The relevant background, as shown by the record, including three days of testimony, can be summarized as follows:

### A. *The Parties*

Euro–Cut is a New Jersey corporation that sells ready-to-eat shelf-stable kosher meals and self-heating shelf-stable kosher meals. Abe Halberstam ("Halberstam") is Euro–Cut's chief executive officer and president.

Futersak is a New York domiciliary, residing in Nassau County, New York. Marketrend is a New York corporation, through which Futersak sells shelf-stable meals.

### B. *Shelf–Stable Meals*

Shelf-stable meals have a 24–month shelf life, making them suitable for use by the military and by various emergency relief agencies, such as the American Red Cross ("Red Cross"). Halberstam formed the idea of making "kosher" shelf-stable meals in 1999 after attending a Y2K conference. Euro–Cut began selling such meals in 2002 to various independent stores and distributors, kicking off those sales at "Kosher Fest 2002"—an industry trade show. Euro–Cut produces meals that are "glatt" kosher, a strict or high level of kosher food.

In 2002 or 2003, Halberstam met with William Beatty ("Beatty") of the Red Cross regarding the Red Cross's need for

Darren Oved, Eric Scott Crusius, Oved & Oved LLP, New York City, for Plaintiff.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Euro–Cut, Inc. ("Euro–Cut") brings this diversity action against defen-

shelf-stable meals. Euro–Cut made its first sale of kosher meals to the Red Cross in 2004.

Kosher shelf-stable meals are more expensive to produce than comparable non-kosher meals. In addition, shelf-stable meals containing items other than just an entree are more expensive than meals with solely an entree. Non-kosher shelf-stable meals that are not self-heating are priced between $2.00 and $3.00 at retail establishments, while the self-heating variety are priced between $3.00 and $4.00. By comparison, kosher shelf-stable meals that are not self-heating are priced between $3.50 and $3.99, while the self-heating variety are priced between $4.50 and $4.99. Euro–Cut sold kosher self-heating shelf-stable meals to the Red Cross for $5.00 per meal.

## C. Futersak's Employment With Euro–Cut and the Employment Agreement

In April 2004, Euro–Cut hired Futersak to act as director of marketing and sales. EuroCut paid Futersak a salary of $10,000 per month. Futersak worked from his home in Cedarhurst, New York, visiting Euro–Cut's New Jersey office approximately every other month. Given his position, Euro–Cut maintains, Futersak was exposed to certain proprietary information about Euro–Cut's customers, including pricing structure, past ordering history, and contact information, which he agreed to hold in strict confidence.

After one year, Euro–Cut purportedly became dissatisfied with Futersak for his failure to generate sufficient sales. As a result, in April 2005, the parties executed a written "Employment Agreement," drafted by an attorney for Euro–Cut, which reduced Futersak's salary to $5,000 per month and 3% commission on all sales upon presentation of a purchase order (the "Agreement"). The Agreement contains the following restrictive covenant:

Employee agrees not to solicit or attempt to take business away from Employer so long as Employee remains in the employ of Employer and for twenty four (24) months thereafter. [Emphasis omitted.]

Employer acknowledges that Employee may have secured a client base prior to Employee's employment with Employer. As such, upon the termination of Employee's employment with Employer and for a period of twenty four (24) months thereafter, Employee may utilize said client base in connection with the marketing and sales of products other than the type that Employer produces.

Hearing Exhibit Binder ("Hearing Ex."), Ex. 4. The Agreement further provides that it "shall be governed and construed in accordance with the laws of the State of New Jersey." Id. Halberstam claims that Euro–Cut chose New Jersey law because "we knew that the State of New Jersey has more stringent kosher laws and our office is in the State of New Jersey." Supplemental Transcript and Exhibit Binder ("Supp.Ex."), Ex. B, at 159.

After Futersak purportedly failed to increase sales, he was terminated in October or November 2005. Pursuant to the Agreement, Futersak was paid through December 2005.

## D. The Disputed Transaction Between Defendants and the Red Cross

In January 2006, Futersak contacted Brittney Dupuy ("Dupuy") at the Red Cross to solicit the sale of meals on defendants' behalf. From this contact, defendants eventually contracted to sell the Red Cross 250,000 self-heating shelf-stable meals in or about March 2006 (the "disputed transaction"). The disputed transaction triggered the present action.

Initially, neither party called a Red Cross official to testify at the hearing.

However, given the Red Cross's involvement in the disputed transaction, the Court directed that a Red Cross representative be called as a witness. To this end, the Red Cross arranged for Dupuy to testify.

According to Dupuy, when Futersak contacted her in January 2006, she believed he was no longer working for Euro–Cut, but she assumed he was going to sell the Red Cross kosher meals. In response to Futersak's solicitation, Dupuy contacted Red Cross vice-president Armand Mascelli for permission to spend money on the meals. However, Futersak did not specify to Dupuy whether he was selling kosher meals or non-kosher meals. Rather, he advised her, in a February 6, 2006 e-mail, that his company, Marketrend, "will be supplying the meals like last year." Hearing Ex. 6. That e-mail, according to Dupuy, corrected an error she made, namely, she inadvertently sent Futersak a procurement document entitled "Procedures for Accessing LaBriute," a reference to Euro–Cut. Futersak clarified that Marketrend was the supplier, and Dupuy corrected the form to read, "Procedures for Accessing Marketrend Products." Hearing Ex. 7. Still, Futersak did not indicate whether he was selling kosher meals or non-kosher meals. In any event, Dupuy eventually arranged for the Red Cross to purchase 250,000 self-heating shelf-stable meals from Futersak and Marketrend at $5.00 per meal, as per a purchase order dated February 15, 2006 and signed February 23, 2006. Hearing Ex. 8. As reflected in that purchase order, Dupuy and other Red Cross officials believed, at that time, that the Red Cross was purchasing kosher meals. *Id.*

Meanwhile, Halberstam learned from Tim Zimmerman of Heater Meals—a Red Cross non-kosher meal supplier—that the Red Cross would be seeking to purchase 250,000 kosher meals from Euro–Cut within a week or ten days. However, after not receiving confirmation of the order a week later, Halberstam testified that Zimmerman told him that the order was given to Futersak and Marketrend.

On March 6, 2006, Dupuy sent an e-mail to Futersak asking him whether Euro–Cut was aware of the disputed transaction between defendants and the Red Cross, as she had received a voicemail from Halberstam indicating that Halberstam heard that the Red Cross was interested in purchasing kosher meals. Futersak replied to Dupuy by e-mail the same day, stating: "I am not working with him. He doesn't know I am working directly with the Red Cross. He wasn't able ro [sic] come through last year [sic] that's why I went on my own and was able to provide your [sic] with the meals. Please don't mention our rellationship [sic]. Please call me." Hearing Ex. 9.

Nevertheless, on or before March 9, 2006, the Red Cross and Dupuy became aware that there was a dispute between Euro–Cut and defendants, with Euro–Cut maintaining that Futersak was prohibited from selling the Red Cross kosher meals. By e-mail on March 9, 2006, Dupuy wrote to Futersak, advising: "It has come to our attention that we might have a conflict of interest. [Halberstam], your old boss, is stating that he has a non-competitive contract that you signed, and that you might be in violation." Hearing Ex. 11. Futersak responded by acknowledging that "there was some type of agreement with [Halberstam] my old boss on certain retail items," but advising that "it doesn't apply to our agreement together." *Id.*

Meanwhile, defendants' counsel sent a letter, dated March 9, 2006, to Euro–Cut indicating that the disputed transaction with the Red Cross involved "non-kosher" meals. Hearing Ex. 5. In response, Euro–Cut's counsel (not current trial counsel)

sent a letter, dated March 10, 2006, to defendants' counsel, advising that Euro–Cut has "no objection to your client providing to the American Red Cross, or any other customer for that matter, non-kosher shelf-stable meals." Affirmation in Opposition to TRO, Ex. A. However, the March 10 letter advised that Euro–Cut "believes that the restrictive covenant ... prevents your client from selling kosher shelf-stable meals or kosher shelf-stable self-heating meals to any customer of Euro–Cut for a period of 24 months from the date your client's employment with Euro–Cut was terminated." *Id.*

On or about March 11, 2006, Dupuy learned that the meals the Red Cross ordered from defendants were non-kosher. As a result, Dupuy sent an e-mail to Futersak on March 11, 2006, asking him if he was supplying the Red Cross with kosher meals. She explained that she "didn't have that in the requirements document, because I thought it was understood, but the contract and PO state that, so I just want to cover my bases." Hearing Ex. 11. Futersak offered a vague response, professing to be "confused," and stating that "[b]ased on the requirements documents and ongoing email correspondence together my understanding was that you were purchasing from Marketrend ... the same high quality meals that were provided to you last year." *Id.* Dupuy responded that she had made a "terrible assuption [sic]" that the meals the Red Cross ordered from defendants were kosher, telling Futersak, "[y]ou have never said they were not," and adding, "the reason we wanted to do business is for Kosher meals." Hearing Ex. 12. At the hearing, Dupuy acknowledged that she had made a "dangerous assumption" that Futersak was selling kosher meals, but that Futersak "clarified it for me." Supp. Ex. C, at 81.

Only after obtaining the Red Cross's order did Futersak specifically inform Dupuy that the order was not for kosher meals, but instead, "kosher-style" meals. In this respect, Futersak advised Dupuy, in a March 12, 2006 e-mail, that he was providing "kosher-style" meals. He explained that "[t]hose meals last year did have a kosher status but I didn't think you were purchasing for 'kosher' reasons because no one on the Gulf Coast needed 'kosher' because that would only appeal to the ultra orthodox which has no population on any of [sic] hard hit areas and really any large populated hurricane areas." Hearing Ex. 12. He offered to explain to her by phone the difference between "labriute kosher" or "glatt kosher," which, he wrote, appeals to "utlra [sic] orthodox end user[s]," and "regular kosher style," which, he wrote, "[a]ppeals to the masses." *Id.*

Dupuy testified that, in response, she discussed the "change" with Red Cross personnel, including her boss, John Kappert ("Kappert"). She testified that the Red Cross was "comfortable" with receiving non-kosher meals. Supp. Ex. C, at 37. According to Dupuy, the Red Cross decided that it would proceed with the purchase from defendants at the agreed price of $5.00 per meal, significantly more than the $2.89 per meal the Red Cross had previously paid another vendor for non-kosher self-heating meals, because defendants' product was of "[h]igher quality"—based on the Red Cross's taste tests with meals made or provided by others. Id. at 40–41. According to Dupuy, the price range for a non-kosher meal, in a "non-distress" situation, is "[b]etween $2.89 and $5.40." *Id.* at 23. As a result, the Red Cross changed its purchase order to reflect the "kosher-style" designation, but the price was not changed. Hearing Ex. 2; Supp. Ex. C, at 36.

At the hearing, Dupuy explained that the only reason she told Futersak in the March 11 email that the Red Cross wanted

"Kosher" meals was "because that is what we had gotten from him before," but she insisted that the Red Cross did not "care whether it gets kosher or non-kosher." Supp. Ex. C, at 42.

Dupuy further explained that she told Futersak that she was "putting the order on hold until we were given some kind of documentation that it was okay to go on further with this buy." *Id.* at 67. In response to her request, Euro–Cut's counsel sent her a letter, dated March 17, 2006, providing: "I have advised [Mr. Futersak's] attorney that as long as Mr. Futersak is selling non-kosher meals my client has no objection to the conduct of his business. If, however, what I have been told is not true and Mr. Futersak is actually attempting to sell kosher meals, then my client considers that to be prohibited by their agreement." Hearing Ex. A; Supp. Ex. C, at 67–68. Dupuy understood the letter to mean that Euro–Cut had no objection to the Red Cross's purchase from defendants "so long as the meals were not kosher." Supp. Ex. C, at 68. She maintained that the Red Cross would not have proceeded with the disputed transaction if the meals were kosher. *Id.* at 68–69.

On May 3, 2006, Phillip C. Yenrick, on behalf of the Red Cross, entered into a contract underlying the disputed transaction. Hearing Ex. 13. Although the contract contains some references to "kosher" meals,[1] Dupuy testified that the Red Cross clearly understood that it was purchasing non-kosher meals from defendants.

Defendants represent that the meals they sold to the Red Cross in the disputed transaction are in storage and available for delivery to, or upon the direction of, the Red Cross. At the hearing, defendants submitted a sample meal from the disputed transaction. The term "kosher-style" does not appear on the packaging of the sample meal.

### E. *Kosher–Style*

Euro–Cut maintains that the term "kosher-style" is "inherently deceptive." To support its position, Euro–Cut cites, inter alia, a New Jersey law making it illegal to sell foods labeled as "kosher-style" without a disclaimer that such goods are "non-kosher." *See* N.J. Stat. Ann. § 2C:21–7.4. In addition, by amicus curiae submission, Agudath Israel of America, a national orthodox Jewish organization, opines that the term "kosher-style" "cannot in our view be construed as anything other than a deliberate attempt to mislead both the purchasing agency and the unsophisticated consumers of the product into thinking that the product is truly kosher." Letter from Agudath Israel of America, dated June 14, 2006.

Nevertheless, the testimony indicates that the term "kosher-style" signifies an ethnic type of food that has kosher-style ingredients, but that it does not mean kosher. More specifically, the Red Cross understood that "kosher-style" in the disputed transaction did not mean kosher.

### F. *Futersak's Alleged Violation of the Agreement and Use of Proprietary Customer Data*

Euro–Cut contends that Futersak violated the Agreement by marketing and sell-

---

1. For instance, the Red Cross "Prepayment Request Form," dated May 5, 2006 and signed by Yenrick May 6, 2006, authorized "50% due upon executions of contract for DS [Disaster Services] Kosher meals, balance due upon completion of 250,000 meals total to be paid $1,250,000." Hearing Ex. 14. Pursuant to Attachment 1.0, the Red Cross designated and identified the order as "D122–Kosher meals," and the "Ordering and Delivery" section provided that the "[v]endor will label the shipments of Goods as ... 'Product # D122–Marketrend (K) Heater Meals.' " Hearing Ex. 13.

ing meals to the Red Cross using Euro–Cut's "proprietary customer data," which, it maintains, includes contact information, pricing structure, and past ordering patterns, to solicit business away from Euro–Cut. Euro–Cut maintains that before it hired Futersak, he never sold any products to the Red Cross. According to Euro–Cut, Futersak became the face of Euro–Cut to many of its customers, including the Red Cross, through his work for Euro–Cut.

Halberstam testified that he would not have authorized his counsel to write letters permitting Futersak to sell "non-kosher" meals to the Red Cross had he known the circumstances of the disputed transaction. Euro–Cut maintains those circumstances included the fact that the Red Cross initially thought it was purchasing kosher meals from Futersak; that Futersak misled the Red Cross into believing it was purchasing kosher meals; that Futersak used the same price Euro–Cut had used in past sales of kosher meals to the Red Cross; and that Futersak explained to Dupuy that he was selling "kosher-style" meals only after she learned that he was not selling kosher meals. Halberstam contends that Futersak's use of the term "kosher-style" was an attempt to circumvent the Agreement. Nevertheless, Euro–Cut concedes that the Agreement does not prohibit Futersak (and, therefore, defendants) from marketing and selling "non-kosher" meals.

Futersak testified that before he worked for Euro–Cut, he developed a client base of supermarket retail chains to whom he marketed various kosher food products for various companies including a muffin company, a salad company, a biscotti company, and a pizza company. During that time, he tried unsuccessfully to sell fleece blankets to the Red Cross, making contact with the Red Cross through its "logistics division." He claims that while working for Euro–Cut, he developed contacts with Kappert and Dupuy (in the logistics division) of the Red Cross. He acknowledges that, while he was employed by Euro–Cut, the Red Cross—presumably Dupuy and Kappert—would contact him by phone or email if the Red Cross wanted to obtain meals from Euro–Cut. Although Futersak acknowledged that Halberstam gave him a one-half page customer list (two pages according to Halberstam), he professed not to have used the list. Notably, the list was not put in evidence, and Halberstam could not recall the names on the list. Moreover, there is no evidence that Futersak currently is using or attempting to use Euro–Cut's trade secrets and/or proprietary or confidential information.

At the hearing, Futersak further testified that he wants to sell kosher meals, but he gave no further explanation. Supp. Ex. B, at 211. He also stated, in a submission before the hearing, that "[i]f this court in the future determines that my employment contract's restrictive covenant offends public policy then I would like to sell kosher products also." Affirmation in Opposition to TRO ¶ 2.

### G. The TRO and Request for Preliminary Injunction

Prior to the hearing, the Court issued a temporary restraining order prohibiting defendants from selling "kosher" meals to Euro–Cut's customers until a hearing on Euro–Cut's motion for a preliminary injunction (the "TRO"). Euro–Cut now requests that the TRO be converted to a preliminary injunction prohibiting defendants from "soliciting, selling or attempting to sell [k]osher [m]eals to [Euro–Cut's] customers until December 2007," as well as prohibiting defendants from engaging in the same conduct regarding "kosher-style" meals. Letter from Plaintiff's Counsel to Court, dated July 27, 2006. Euro–Cut also

requests a preliminary injunction prohibiting defendants from "taking any action to continue, further, complete, and/or consummate" the disputed transaction with the Red Cross or, in the alternative, directing that the "profits derived from the [d]isputed [t]ransaction, if consummated, be paid directly to [Euro–Cut] instead of [d]efendants." *Id.*

## II. DISCUSSION

### A. Preliminary Injunction Standard

To obtain a preliminary injunction, a plaintiff must show "irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 113–14 (2d Cir.2006) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

### B. Choice of Law

Euro–Cut argues that the Agreement's choice of law provision requires that the restrictive covenant be interpreted and applied pursuant to New Jersey law. Defendants argue for the application of New York law, although they fail to raise sufficient grounds for challenging the validity of the Agreement's choice of law provision. In any event, the parties have not shown that there is a substantial difference between New York and New Jersey law as to the validity or enforceability of the restrictive covenant.

Under New Jersey law, a restrictive covenant is enforceable if reasonable; that is, it must (a) protect the legitimate interests of the employer, (b) impose no undue hardship on the employee, and (c) not injure the public interest. *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576, 264 A.2d 53 (1970). Similarly, under New York law, a restrictive covenant is reasonable and

enforceable if it "is no greater than is required for the protection of a legitimate interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999). Under the laws of both New Jersey and New York, partial enforcement of a restrictive covenant is permitted, with the court enforcing the covenant to the extent fair and reasonable under the circumstances. *See Solari Indus., Inc.*, 55 N.J. at 585, 264 A.2d 53; *BDO Seidman*, 93 N.Y.2d at 394–95, 690 N.Y.S.2d 854, 712 N.E.2d 1220.

### C. Analysis of Requested Relief

#### 1. Kosher–Style Meals

■ Even assuming, for purposes of this motion, that the restrictive covenant is valid and enforceable as to time and geographic scope, and that Euro–Cut can show irreparable harm, Euro–Cut fails to show that it is entitled to a preliminary injunction prohibiting defendants from marketing and selling "kosher-style" meals. Based on the record, the Court finds that Euro–Cut fails to show a likelihood of success on the merits or substantially serious questions going to the merits, with a balance of hardships tipping decidedly in its favor, as required for this Court to preliminarily enjoin defendants from marketing or selling "kosher-style" meals to Euro–Cut's customers.

The Agreement prohibits Futersak from marketing and selling kosher products of the "type that [Euro–Cut] produces" and from "taking away business from [Euro–Cut]" through December 2007 (two years after Futersak's termination). As noted, Euro–Cut does not maintain that the Agreement prohibits defendants from marketing and selling "non-kosher" meals. Rather, Euro–Cut maintains that the

Agreement prohibits defendants from marketing and selling "kosher" meals. Euro–Cut makes no distinction between the "glatt" kosher meals it sells and other types of "kosher" meals that are not "glatt" kosher.

Even assuming that the Agreement prohibits defendants from marketing and selling "kosher" meals (whether "glatt" kosher or otherwise), the evidence strongly suggests that "kosher-style" does not mean kosher, and it appears unlikely that Euro–Cut can show that the use of the term "kosher-style" is "inherently deceptive" to the presumably knowledgeable purchasers referenced in this action—relief agencies and independent stores and distributors. The marketing and sale of "kosher-style" meals by defendants, without any attempt to deceive or pass the meals as "kosher," does not appear to be a breach of the Agreement. Moreover, Euro–Cut fails to explain how it is or will be injured by defendants' marketing or sale of "kosher-style" meals to these types of purchasers, including the Red Cross. In addition, the term "kosher-style" does not appear on the packaging of the sample meal sold by Futersak to the Red Cross in the disputed transaction, leaving New Jersey law governing food labeling seemingly irrelevant. Accordingly, there is no basis upon which this Court may preliminarily enjoin defendants generally from marketing or selling "kosher-style" meals, and, therefore, the request is denied.

### 2. *The Disputed Transaction*

■ Even though defendants' marketing or sale of "kosher-style" meals, without any attempt to deceive the purchaser or pass the meals as "kosher," does not appear to be a breach of the Agreement, the evidence is sufficient to raise at least a substantially serious question as to whether defendants intentionally attempted to deceive the Red Cross or pass the meals as "kosher" in order to secure the disputed transaction. While it is not clear whether Futersak initially attempted to sell kosher meals to the Red Cross, the evidence indicates that Futersak intentionally failed to tell Dupuy initially—and clearly—that he was selling non-kosher meals. Futersak later wrote to Dupuy that he "will be supplying the meals like last year," language seemingly calculated to mislead Dupuy, by allowing her to infer that defendants were providing kosher meals. Moreover, the evidence shows that Futersak used the same price per meal in the disputed transaction as Euro–Cut had used with the Red Cross in the past for kosher meals, and that, in securing the disputed transaction, Futersak used Euro–Cut's Red Cross contact, Dupuy—albeit a contact he generated while working for Euro–Cut. As Euro–Cut argues, a customer list and related contact and pricing information may be protected proprietary or confidential information. *See Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 298–300, 770 A.2d 1158 (2001); *Whitmyer Bros. v. Doyle*, 58 N.J. 25, 33, 274 A.2d 577 (1971). Here, there is evidence that Euro–Cut kept its customer and related contact and pricing information confidential, entitling that information to protection. Although Euro–Cut conceded, by its counsel's letter, that Futersak was not prohibited from contacting the Red Cross to sell non-kosher meals, it did not know that Futersak may have used its pricing information and intentionally misled the Red Cross into believing it was purchasing kosher meals. Under the circumstances, there are substantially serious questions going to the merits as to whether defendants' conduct amounted to a breach of the Agreement and violation of Euro–Cut's rights in confidential information, in that Futersak intentionally misled the Red Cross into believing that it was purchasing kosher meals and he used Euro–Cut's customer and related contact

and pricing information to obtain a sale that might otherwise have gone to Euro–Cut. In addition, under these circumstances, a balancing of the hardships tips decidedly in EuroCut's favor.

Furthermore, these circumstances are sufficient to show irreparable harm to Euro–Cut. An unlawful use of a former employer's confidential customer and related contact and pricing information, with possible injury to the former employer's goodwill and customer relations, constitutes irreparable harm. *See Unisource Worldwide, Inc. v. Valenti,* 196 F.Supp.2d 269, 280 (E.D.N.Y.2002).

Nevertheless, the Court finds that the circumstances do not justify enjoining the disputed transaction, given that the Red Cross did not enter the disputed transaction until it was fully assured that the meals were non-kosher and given that the meals are ready for delivery to, or upon the direction of, the Red Cross. Accordingly, Euro–Cut's request for a preliminary injunction prohibiting defendants from "taking any action to continue, further, complete, and/or consummate" the disputed transaction with the Red Cross is denied, as is the alternative request that the profits derived from that transaction be paid directly to Euro–Cut.

### 3. *Kosher Meals*

As for Euro–Cut's request for a preliminary injunction prohibiting defendants from "soliciting, selling or attempting to sell [k]osher meals to [Euro–Cut's] customers," that request is denied because it is not clear whether defendants intend or are soliciting, selling or attempting to sell "kosher" meals to "Euro–Cut's customers." As the record reflects, Futersak acknowledged at the hearing that he wants to sell kosher meals, but he gave no further explanation. Supp. Ex. B, at 211. While he asserted before the hearing that he "would like to sell kosher products

also," he conditioned that intention on the Court determining that the "restrictive covenant offends public policy." Affirmation in Opposition to TRO ¶ 2. Moreover, apart from the disputed transaction, there is no evidence that defendants are using any of Euro–Cut's so-called "proprietary customer data" in connection with any solicitation or sale of "kosher" meals. Euro–Cut states that it does not seek to prevent defendants from soliciting, selling or attempting to sell kosher meals to defendants' "own base of customers." Plaintiff's Letter Brief, dated July 27, 2006, at 3. Indeed, Euro–Cut expressly concedes that the restrictive covenant is "specifically limited to [Euro–Cut's] customers." *Id.* Accordingly, Euro–Cut's request for a preliminary injunction prohibiting defendants from soliciting, selling or attempting to sell "kosher" meals to "Euro–Cut's customers" appears not to be ripe for preliminary determination, and, therefore, the request is denied.

## III. *CONCLUSION*

For the above reasons, Euro–Cut's motion for a preliminary injunction is denied. The Clerk of Court is directed to terminate the pending motions.

The parties are directed to conduct expedited discovery, to be followed by an immediate trial. The parties are directed to contact chambers to schedule an immediate conference to discuss further proceedings in this action, including expedited discovery and trial.

SO ORDERED.